Kevin Murphy
WUERSCH & GERING LLP
100 Wall Street, 10th Floor
New York, NY 10005
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

SERGEY VIKTOROVICH PAUSHOK,                    Civil Case No.: 2020-_____

           Plaintiff

        v.                                            **COMPLAINT**

TORDAI GANBOLD;
GAZPROMBANK JSC;
BATZORIG BAATAR;
OLEG TITARENKO;
VLADIMIR PROTASOV;
ALEXANDER MURANOV

           Defendants
-------------------------------------------------------------x

      Plaintiff Sergey Viktorovich Paushok (hereinafter "Plaintiff" or "Paushok,") by its

attorneys, Wuersch & Gering, LLP, for its Complaint against Tordai Ganbold ("Ganbold"),

Gazprombank OJSC ("GPB"), Oleg Titarenko ("Titarenko"), Vladimir Protasov ("Protasov")

and Alexander Muranov ("Muranov") (at times, collectively, "Defendants"), hereby alleges as

follows:

### NATURE OF THE CASE

1.     Defendants are joint tortfeasors who have engaged in an extensive scheme involving the

filing of perjurious affidavits upon the Supreme Court of the State of New York Court to enforce

a defunct personal guaranty on Plaintiff.  In the course of an Article 53 proceeding to enforce a

foreign judgment, Defendants knowingly colluded in the preparation of false documents and

false affidavits in purported support of the admissibility of those documents allegedly evidencing

1

that Plaintiff was responsible for a debt that did not exist.  Through these falsehoods, Defendants

successfully duped the Supreme Court of the State of New York into rendering a judgment in the

amount of over $25 million against Plaintiff (the "New York Judgment of Enforcement").

Defendants did so throughout using the shell company BatBrothers LLC.  Moreover, once the

New York Judgment of Enforcement was issued, Defendants Batzorig Baatar and his superior

Tordai Ganbold, through BatBrothers LLC, promptly employed the New York Judgment of

Enforcement in 2019 against Plaintiff's accounts in Swiss banks to freeze Plaintiff's assets.

Plaintiff's assets remain frozen to this day.

2.      These falsehoods were recently uncovered in a criminal investigation for tax evasion and

tax fraud in Mongolia, and are fully disclosed in the affirmation of Tsogtgerel Nyamsuren,

attached as Exhibit 1 to this Complaint.  Mr. Tsogtgerel was a direct witness to the scheme to

defraud as he served as First Deputy Director for Legal Affairs at Altandornod Mongol LLC

(also known as Golden East Mongolia)(hereinafter "GEM"), run through intermediaries by

Defendant Ganbold.  Ganbold was the mastermind of the scheme to defraud Plaintiff.

## PARTIES

3.      Plaintiff Sergey Viktorovich Pauhok is an individual residing in Latvia.

4.      Defendant Tordai Ganbold is mastermind of the scheme to defraud Plaintiff.  He resides

in Ulaanbaatar, Mongolia.

5.      Defendant Batzorig Bataar ("Batzorig") is the purported General Director and CEO of

BatBrothers LLC.  Defendant Batzorig resides in Ulaanbaatar, Mongolia.

6.      BatBrothers LLC is a shell company under the nominal control of of Batzorig, but under

the de facto control of Ganbold.  Its principal place of business is in Bayanzurkh District,

Ulaanbaatar, Mongolia.  BatBrothers is not now named as a Defendant but Plaintiff intends to

implead this shell company once the New York Judgment of Enforcement is vacated in the Supreme Court of New York, New York County.

7.      Defendant Gazprombank JSC is a privately-owned bank with an address at 16 Nametkina St., bldg.1, 117420 Moscow, with its principal place of business at 63 Novocheremushkinskaya St., 117418, Moscow.

8.      Defendant Oleg Titarenko is an individual and is a resident of the Russian Federation. Defendant Titarenko throughout the events pertinent hereto has been the Head of the Distressed Business Unit of Defendant GPB.

9.      Defendant Alexander Muranov is an individual and a resident of the Russian Federation. Defendant Muranov was the Deputy Chairman of the Management Board of GPB, responsible among other things for operations with precious metals, and aware of the actions of GPB described herein.

10.      Defendant Vladimir Protasov is an individual and a resident of the Russian Federation. Through the present, he has been a manager of the Distressed Business Unit of Defendant GPB and reported to Defendant Titarenko.

## JURISDICTION AND VENUE

11.      The jurisdiction of this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1367.

12.      Venue is proper pursuant to 28 U.S.C 1391(b)(2) as a substantial part of the events giving rise to the claim occurred in this judicial district.

13.      This Court has general and specific personal jurisdiction over Defendant GPB as it as transacted business within the State, and availed itself of the laws of New York State.

14.     This Court has general and specific personal jurisdiction over Defendant Batzorig Baatar as he transacted business within the State, and availed himself of the laws of the State of New York.

15.     This Court has general and specific personal jurisdiction over Defendant Tordai Ganbold as he at all times pertinent hereto caused Defendant Batzorig Baatar to transact business within the State, and availed himself of the laws of the State of New York.

16.     This Court has general and specific personal jurisdiction over Defendants Titarenko, Protasov and Muranov as these Defendants authorized the commission of tortious acts in New York State, with the intent to benefit thereby.

## STATEMENT OF FACTS

17.     In 2006, GEM, under the leadership of Plaintiff as CEO, was a successful gold-mining enterprise in Mongolia.

18.     On February 9, 2006, Gazprombank (GPB) entered a loan agreement (the "Loan Agreement") with GEM whereby GPB loaned $30,000,000 USD to GEM in three installments. The agreement envisaged that the Loan Agreement would be repaid by September 30, 2008. GEM pledged $6,232,146.20 of its equipment assets and $33,767,853.77 of GEM's mining licenses and mineral exploitation licenses to GPB (the "Pledged Collateral") under the Loan Agreement.

19.     In conjunction with the Loan Agreement and on the same day as the Loan Agreement, Plaintiff, then an executive at GEM, executed a surety agreement ("Surety").  Under the terms of the Surety, in the case of GEM's failure to fulfill its liabilities, Plaintiff became secondarily liable along with GEM who was primarily liable for outstanding liabilities, after satisfaction against the Pledged Assets.

20.     Shortly after the entry of the Loan Agreement, on or about May 12, 2006, the

Government of Mongolia imposed a 68% Windfall Profit Tax on all sales of gold exceeding a

base price of $500 per ounce.

21.     On July 8, 2006, Mongolia through passage of the Minerals Law restricted all companies

from staffing more than 10% of its workforce with foreign workers.

22.     The imposition of the Windfall Profit Tax and Minerals Law made GEM's gold mining

operation unsustainable.

23.     Although from 2002 through 2006, GEM had been in a position to borrow $120 million

and repay $104 million with interest to GPB, GEM was not in a position to do so after the

imposition of the Windfall Profit Tax and Minerals Law.

24.     Plaintiff made multiple requests to GPB to restructure the Loan Agreement and secure

the Pledged Assets.  As of May 2010, GEM no longer had any control over the Pledged Assets,

and notified GPB to that effect.  GPB ignored Plaintiff's requests.

25.     Based on an increase in the price of gold from $650 per ounce in 2006 to $1,900 per

ounce by 2011, Plaintiff, based on information and belief, the source of which is an independent

evaluation for an American bank, GEM was worth over $2 billion with yearly revenue of $100

million in 2011.

26.     In 2009, during the course of Plaintiff's arbitration under the United Nations Commission

on International Trade (UNCITRAL) over the imposition of the Windfall Profit Tax and

Minerals Law, the Mongolian government seized all offices, bank accounts, mines and all

subsidiaries belonging to GEM.

27.     In addition, in direct response to Plaintiff's filing of a demand for UNCITRAL

arbitration, the Mongolian government issued a baseless arrest warrant against Plaintiff, seeking

his arrest for certain criminal acts. These charges were brought for corrupt motive, and all were dismissed against Plaintiff in 2011. The Mongolian Ministry of Justice and its police are well-known for the detention of suspects, sometimes secretly, without judicial authorization. *See* U.S. State Department, Human Rights Report, 2019, Section 1D.[1]  When he heard that an arrest warrant had been issued, Plaintiff left Mongolia for Moscow in the Russian Federation. No attempt was made to extradite Plaintiff.

28.     In April 2011, an agent of the Mongolian Prosecutor-General, Mr. Byamba, contacted Plaintiff and requested a meeting with Plaintiff to discuss the sale of GEM. Plaintiff met with Mr. Byamba and Mr. Bator, the brother of the Mongolian Prosecutor-General, Dorligzhav Dambiin, in Moscow. Mr. Byamba informed Plaintiff that Plaintiff was finished in Mongolia and would need to sell his assets at a steeply-discounted price (about 1% of its value) to a Mongolian citizen, i.e., Mr. Bator. Sale of GEM at that price would result in all of Plaintiff's problems "going away."

29.     Under pressure, Plaintiff drafted a Memorandum of Understanding (MOU) for the sale of GEM to Mr. Bator with Mr. Byamba as the 1st Deputy Director. That MOU was signed on May 5, 2011. An agreed pre-payment of $2 million to Plaintiff was made through Mongolian bank Golomt. A further $18 million was required to complete the transaction.

30.     On May 17, 2011, Plaintiff received a fax from Mr. Byamba from the Office of the Prosecutor General notifying Plaintiff that the criminal allegations had been dismissed. Mr. Byamba began using corporate assets of GEM, including Plaintiff's GEM company car.

---

[1] https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/mongolia/

31.     In August 2011, Defendant Ganbold contacted Plaintiff and at a meeting in Moscow in the same month, offered to pay the remaining $18 million to purchase GEM himself.  But Defendant Ganbold required that Plaintiff terminate the MOU.  A new MOU (MOU2) would be entered between GEM and Defendant Ganbold's wholly-owned corporation Phoenix Sino Limited ("Phoenix").  The following day, August 4, 2011, Plaintiff and Defendant Ganbold executed MOU2, which listed GEM's assets and liability including the Loan Agreement and Surety.  Both Defendant Ganbold and Plaintiff signed in their personal capacities, demonstrating the intent that the liabilities in both the Loan Agreement Surety would be covered in any sale of assets or shares.  Defendant Ganbold provided proof of his ownership of Phoenix to Plaintiff. Upon information and belief, Defendant Ganbold reimbursed Mr. Byamba for the $2 million paid to Plaintiff.

32.     On September 9, 2011, Defendant Ganbold and Plaintiff entered an Agreement for the Sale and Purchase of Shares ("2011 Share Purchase").  Exhibit 2, attached.  Plaintiff executed in his personal capacity, while Defendant Ganbold executed as Managing Director of Phoenix. Defendant Ganbold and Plaintiff understood this would resolve any residual obligations Plaintiff had under the Surety.  The Surety obligations were listed among the liabilities of the Loan Agreement.

33.     Defendant Ganbold was well-acquainted with the liabilities of GEM, including the Loan Agreement.  In August 2011, Plaintiff introduced Defendant Ganbold and his representatives to GPB representatives, Defendants Titarenko and Protasov.  Multiple meetings between Ganbold and Defendants Titarenko and Protasov ensued for the purpose, Plaintiff believed, of transitioning GEM to Phoenix operations.

34.     In reality, Defendants Ganbold, Titarenko and Protasov agreed to a plan whereby Ganbold's Phoenix would default on its then-existing obligations to GPB, and GPB would instead sue Plaintiff under the Surety in Russia and secure a Russian judgment.  Ganbold would employ a front company that would purchase the steeply-discounted debt from GPB, and sue to enforce the Russian judgment in other jurisdictions.  The purchase money for the debt would be provided by Ganbold.  In the meantime, the front company would seize and sell the Pledged Collateral.  Upon information and belief, a portion of the revenue from Pledged Collateral would be provided GPB and Defendants Titarenko, Protasov and Muranov as a kind of "bonus."  GPB would use its influence in the Russian courts and with prosecutors in Moscow where Plaintiff lived to pressure Plaintiff into paying a debt he did not owe.  Defendant Ganbold would thus have the benefit of revenue flowing to him through the front company free of any taxes to be paid on behalf of Phoenix or GEM to the Mongolian government.  Defendant Ganbold would have the added benefit of placing the Pledged Assets out of the reach of one of the largest Mongolian banks, Golomt Bank, against which GEM was in litigation in the Mongolian courts.

35.     GPB would encourage Plaintiff to settle this "bonus" by putting Plaintiff under maximal pressure, funding litigation in multiple jurisdictions against Plaintiff and encouraging the opening of criminal investigations and/or prosecutions while Plaintiff resided in Russia.

36.     In and around the time this plan was hatched, Nyamsuren Tsogtgerel, served as the Deputy Director for Legal Affairs at GEM.  In his affirmation, he attests to the plan, its aims, and its outcome in defrauding Plaintiff and the New York Supreme Court.  The Tsogtgerel Affirmation is attached as Exhibit 1.

37.     The scheme required fraud on multiple levels including to the New York Supreme Court, in which GPB eventually filed an action under CPLR Article 53 to enforce a judgment it secured

8

against Paushok in December 2011.  The gravamen of Plaintiff's allegations and legal claims against Defendants are based on the fraud and the misrepresentations foisted upon that court in this judicial district.

38.     Plaintiff has brought this action in this judicial district to avail himself of the protections against this conduct set forth in the Federal Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et seq., and potentially other sources of federal law.  Plaintiff intends to move the New York Supreme Court issuing the New York Judgment of Enforcement to vacate its ruling.

**The Russian Judgment**

39.     In or about September 2011, although GPB, and at least Defendants Ganbold, Titarenko and Protasov, were fully aware that Plaintiff was no longer liable under the Surety, GPB filed an action for collection of debt under the Loan Agreement in the Cheremushki District Court in Moscow.  The action sought payment of $16,500,000 in principal, interest of $8,530,650.18 in interest, and 60,000 (RUB) in costs.

40.     Neither GPB nor the Russian court, provided notice to Plaintiff and a default judgment issued on December 12, 2011.  Plaintiff was made aware of the issuance of the default judgment and filed an appeal to the cassation court in Moscow.  That court, once again without notice to Plaintiff and in his absence, affirmed the default judgment.

41.     In 2012, GPB registered the Russian Judgment with the Russian Federal Bailiff's Service ("Bailiff's Service") in Moscow.  GPB began collecting directly from Plaintiff through the Bailiff's Service.

**The New York Action and the Fraudulent Purchase of GPB Debt**

42.     On January 6, 2015, GPB filed a Complaint in this Court against Plaintiff under Index

No. 150122-2015, seeking enforcement of the Russian Judgment under Article 53 of the CPLR

(the "New York Action").  The action sought a judgment in excess of $25 million from Plaintiff.

43.     In or about March 2015, Defendant Titarenko contacted Plaintiff and requested that

Plaintiff recommend a party in Mongolia who would be in a position to recover monies from

GEM under the Loan Agreement.  Plaintiff recommended one of the largest privately owned

banks in Mongolia, Golomt Bank ("Golomt").  After meetings with Defendants Titarenko and

Protasov, Golomt offered to purchase GPB's $25 million debt for $10 million.  The facts and

circumstances of those meetings are set forth in the affirmation of Bayasaglan Danzandorj, the

controlling shareholder of Golomt Bank, whose affirmation is attached as Exhibit 3.

44.     Following an extensive due diligence between GPB and Golomt, Golomt learned that

Defendant Ganbold instead offered and in fact did purchase from GPB its debt under the Russian

Judgment for $6 million dollars, $4 million less than Golomt Bank had been offering.  Golomt

further learned that purchase was made on behalf of BatBrothers LLC, whose CEO is Defendant

Batzorig Baatar, known to Golomt as an affiliate of Defendant Ganbold.  Ex. 3 at ¶12.  In

essence, Defendant Ganbold bought the debts of his own company at a discount and assigned

them to his associate, Defendant Batzorig's company, BatBrothers LLC.

45.     In fact, as Mr. Tsotgerel affirms, Defendant BatBrothers LLC is an "empty shell

company registered in [Defendant] Batzorig's name, which has not been operating since its

inception, with share capital of 1 million tugriks (approximately US$500), and its tax returns

filed with the tax authorities have shown only zeros.  BatBrothers is registered at the old home

address of Batzorig…but the main office of BatBrothers is located in the same building as

GEM." Ex. 1 at ¶16. "[Defendant] T. Ganbold is also the ultimate owner and beneficiary of BatBrothers.  Although Batzorig is registered as a shareholder and Director General of BatBrothers, [Defendant] Ganbold makes all managerial and financial decisions related to the company's activities and further instructs Batzorig. B. Batzorig reports to T. Ganbold about his activities in relation to BatBrothers and follows his instructions." Ex. 1 at ¶16.  Further, from 2012-2016, Defendant Batzorig in fact worked under Defendant Ganbold at GEM as a sales manager for precious metals.  *Id.* at ¶15. Defendant Batzorig also acts as a trustee and representative of shareholders of Offshore Incorporations Limited and Vistra, which corporations own Goldstream and Phoenix, corporations in turn owned or operated by Defendant Ganbold. *Id.* at ¶¶7 & 15.

46.     Mr. Tsogtgerel's affirmation is corroborated in the report of the Mongolian Directorate of Social Insurance, who issued a report to the Criminal Office of the Police Department on December 5, 2019.  In the report, Defendant Batzorig worked at GEM from October 1, 2012 to August 1, 2013.  From October 10, 2013 to August 1, 2014, he was employed by Bumbat LLC. Bumbat LLC is wholly owned by Defendant Ganbold. Ex. 1, at ¶7.  On multiple occasions throughout the pendency of the New York Action, litigated from January 2015 to June 2019, Defendant Batzorig worked at both GEM and BatBrothers LLC, including June-September 2017. Ex. 11, attached.

47.     Based upon information and belief, Defendant GPB and/or Defendants Titarenko, Protasov and Muranov, accepted this purchase of debt for $4 million less than available from an empty shell company because the monies fraudulently obtained and pocketed from Plaintiff and the Pledged Assets would be more than sufficient.  Ex. 1, ¶31.  At one meeting in 2015 between Plaintiff and Defendant Titarenko, and Protasov, Defendant Ganbold telephoned and Defendant

Titarenko put him on speakerphone.  Defendant Ganbold offered to buy GEM's debt on behalf of BatBrothers and leave the Surety in place as a "bonus."  In response to Plaintiff's protest at the arrangement, Defendant Titarenko replied in substance: "Don't worry.  We won't do anything bad like this."  Plaintiff replied that "it would be fraud."  Defendant Titarenko said "GPB won't work with fraudsters and fraud ideas like this.  Don't worry."  Despite Defendant Titarenko's promise to Plaintiff to dismiss the case, GPB and Defendant Titarenko reneged.

48.     While the main purpose of selling the right of claim to BatBrothers was "to prevent Golomt's debt risk" and not to seek collection from Plaintiff, Defendant Batzorig stated in substance to Mr. Tsogtgerel that: "GPB's debt collection managers [Defendants Titarenko, Protasov and Muranov] themselves offered T. Ganbold and B. Batzorig to work on the decision of Cheremushkinsky District Court" [the Russian Judgment.] Ex. 1 at ¶34.

49.     On or about June 18, 2015, Defendant Ganbold wired $6,000,000 to GPB, listing BatBrothers LLC as the "ordering customer."  Ex. 4, June 18, 2015 SWIFT transfer memo.  In fact, BatBrothers had no resources to make this purchase.  Ex. 1 at ¶24.  Nothing on the Swift transfer listed Defendant Ganbold.

50.     On the same date, GPB assigned its rights in the Russian Judgment and the Pledged Assets to BatBrothers.  Ex. 5.

51.     At all times pertinent hereto, GPB and BatBrothers engaged in debt collection activities through a Cypriot entity known as Gorsoan, Ltd.  Gorsoan is also an agent of Defendant Ganbold through Defendant Batzorig, who reports directly to Defendant Ganbold.

52.     Despite the assignment of rights to BatBrothers, GPB continued to pay the legal expenses in the New York action.  As of 2018, according to Defendant Ganbold, the legal expenses exceeded $400,000.

53.     On June 22, 2015, a Debt Settlement Agreement was entered between BatBrothers and

GEM, which Defendant Ganbold signed on behalf of GEM. Ex. 6, attached.  Defendant Batzorig

signed on behalf of BatBrothers.  As provided in the Agreement, BatBrothers took possession of

7 mining licenses and 13 units of heavy mining equipment.  *Id.* at 1.3 & 1.4.  These licenses

represented actual value beyond the amount owed to GPB under the Russian Judgment.  One of

the valuable licenses was referred to "290A."  Further monies were to be transferred out of GEM

to BatBrothers from the receipt of collected income from mining sites.  *Id.* at 1.6.  Release of the

specified licenses and equipment would release GEM from any liability to pay GPB-related debt.

*Id.* at 1.8

54.     As Mr. Tstogtgerel has affirmed, "Based on this agreement, GEM's most valuable and

profitable assets were transferred.  For example, one transferred mining license MV-000290

(formerly 290-A) had 688kg of gold reserves (U.S.$25.3 million) at the current exchange rate.

BatBrothers managed the site using the transferred Draga 250DM and an EGSH 5/45 excavator,

under the provision that the contractors would receive the gold produced by BatBrothers on

70:30 basis." (Ex. 1, ¶32.)  Thus, this one of the many Pledged Assets entirely satisfied any

amount owed by GEM under the Loan Agreement, and thus by Plaintiff.

55.     As of January 1, 2015, therefore, there was in fact no debt to be enforced against

Plaintiff.  By virtue of the meetings among Defendants GPB, BatBrothers, Ganbold, Titarenko,

Muranov and Protasov, the Defendants were fully aware as of March 2015 that the Pledged

Assets had been transferred de facto to BatBrothers.  Continued prosecution of the New York

Action was nothing more than a fraud on the New York Supreme Court and on Plaintiff.

56.     On December 3, 2015, in an affirmation filed in the New York action and styled as a

response to a letter from Plaintiff (Dkt. 18), Holland & Knight attorney, representing GPB and

BatBrothers Warren Gluck affirmed that: "evidence will be presented that GEM does not have known assets in Mongolia that are sufficient to satisfy the GEM debts, and the existence of any GEM assets in Mongolia or elsewhere does not preclude enforcement of the Paushok Judgment anywhere." (New York Action, Dkt. 18, ¶28.)

57.     No such evidence was ever provided.  In fact, Defendant BatBrothers at that time held these assets for the benefit of Defendant Ganbold primarily, pursuant to the scheme to defraud Plaintiff.  Ex. 1, ¶27.

58.     On December 21, 2015, BatBrothers was substituted for GPB as plaintiff in the New York Action.

59.     On August 3, 2016, on July 3, 2017 and on August 31, 2017, Defendant Batzorig submitted affidavits in support respectively of BatBrothers' motion for summary judgment, BatBrothers' motion for substitution, and BatBrothers' renewed motion for default judgment against Plaintiff (the "8-3-16 Affidavit," the 7-3-17 Affidavit" and "8-31-17 Affidavit").

60.     In the 8-3-16 Affidavit, Defendant Batzorig claims that BatBrothers is the sole "claimant and creditor under the Russian Judgment" (New York Action, Dkt. 49, ¶24).

61.     In the 7-3-17 Affidavit, Defendant Batzorig claims that BatBrothers currently receives a monthly payment from Plaintiff to satisfy the Russian Judgment (¶5), that BatBrothers is solely entitled to enforce and execute on the Russian Judgment (¶24) and that BatBrothers is the sole claimant and creditor with the right to execute on the Russian Judgment (¶25).  (New York Action, Dkt. 65).

62.     In the 8-31-17 Affidavit, Defendant Batzorig repeats that it is the sole "claimant and creditor under the Russian Judgment" (New York Action, Dkt. 75, ¶31) and further claims that because Plaintiff owed monies to GPB under the Loan Agreement, Plaintiff now owed the same

monies under the enforcement rights GPB assigned to BatBrothers. (*Id*. at ¶27.)  Further,

Batzorig claimed that Paushok continues to be liable under the Russian Judgment.  (*Id*. at ¶37.)

But, at the time Defendant Batzorig executed the 8-31-17 Affidavit, he was receiving money as

an employee of GEM, the very entity Defendants claim never paid BatBrothers or GPB under the

Loan Agreement. The facts and circumstances thus demonstrate that Defendant Batzorig was

executing affidavits under instructions from Defendant Ganbold who controlled both entities.

Further, the assets transferred under the June Settlement Agreement (Ex. 6), which fully satisfied

Plaintiff's debt, had been in Defendant Batzorig's control for some time.

63.     As such, Defendant Batzorig was fully aware that Plaintiff owed no monies to either

BatBrothers or GPB as BatBrothers' title over the Pledged Assets fully satisfied any claim

potentially owing from Plaintiff under the Russian Judgment. *See* Ex. 1, ¶30 ("After

BatBrothers, the company that received the right to claim on the loan from GPB, received the

assets from GEM in the form of cash, the assets and the licenses in accordance with the Debt

Settlement Agreement, claiming the amount of the loans from Paushok as guarantor has (sic) no

basis.")

64.     In conjunction with BatBrothers' motion to dismiss Plaintiff's Counterclaim in the New

York Action, Defendant Batzorig submitted an affirmation dated March 26, 2018 (New York

Action, Dkt. 128)("3-29-18 Affidavit").  There, Defendant Batzorig "unequivocally denied all of

Paushok's assertion of improper or fraudulent conduct in connection with the enforcement of the

Russian Judgment in the Russian Federation and in New York." (*Id*. at ¶5)  Defendant Batzorig

further affirms that his actions were under the advice of counsel and for the legitimate and proper

purpose of collecting the millions of dollars owed by Paushok under the Russian Judgment.  (*Id*.)

65.     Defendant Batzorig submitted the 8-3-16, 7-3-17, 8-31-17, and 3-29-18 Affidavits to this Court, knowing each contained materially false statements to the effect that Paushok owed monies under the Russian Judgment.

66.     Upon information and belief, Defendant Ganbold authorized Batzorig to make these statements in furtherance of the scheme to defraud Plaintiff and this Court. Upon information and belief, GPB and Defendants Muranov, Titarenko and Protasov were also to benefit directly from payments from Paushok in settlement or from executions on the New York Judgment of Enforcement.

67.     Upon information and belief, GPB fulfilled its role in the scheme to defraud Plaintiff by maintaining extrajudicial pressure on Plaintiff.  GBP, one of the largest state-owned banks in the Russian Federation, did this by attempting on many occasions to bring baseless criminal charges against Plaintiff.  In at least 20 communications, beginning on November 15, 2013 to as late as March 2019—despite the assignment of "debt" to BatBrothers in June 2015—Defendant Muranov attempted to convince either the Russian Bailiff's Service or the Ministry of Internal Affairs, Economic Crimes Division to bring a criminal complaint against Plaintiff.  Defendant Titarenko also sent his own letter in October 2015, requesting the assignment of another investigator as a criminal charge had not yet been lodged against Plaintiff.  The investigations were either dismissed or not initiated for lack of evidence.  Upon information and belief, Defendant Muranov has continued to so urge the Economic Crimes Division.  Owing to the realities of life in the Russian Federation, particularly under this incessant pressure, Plaintiff fled Moscow and now resides in Latvia.

68.     Since July 2014, GBP has been under U.S. economic sanctions pursuant to Executive Order 13662 for the Russian Federation's destabilizing activities in Crimea and in the Donbas region.[2]

69.     According to the U.S. Treasury Department, GPB provides services to more than 45,000 companies and 3 million private individuals with over 40 branches and a number of international subsidiaries.

70.     On August 15, 2018, Defendant BatBrothers filed a motion for summary judgment in the New York Action.

71.     In response, Plaintiff submitted tax records GEM filed with the Mongolian Tax Authorities from 2011-2017 showing that there was no or declining debt from GPB on its books during the pendency of the New York Action.  Plaintiff also submitted the tax records in or about the same period filed by BatBrothers.  As of 2017, according to these records, no material debt existed on its books either to GPB or indeed any entity.  No material debt held by GPB or BatBrothers on the books at GEM or BatBrothers in this period, if accurate, would demonstrate that Plaintiff was being defrauded, as indeed he was.

72.     As Mr. Tsogtgerel affirms, "In order to evade the increased corporate income tax rate of 25%, GEM and BatBrothers did not show the revenues from the sale of the gold or from the sale of the licenses to other persons in their financial statements.  M. Ider, [Defendant] B. Batzorig and B Altanuyaa (Ganbold's cousin) sold the gold and the gold mining licenses, and deposited the amounts received in their individual accounts, from there they sent money to the accounts of BatBrothers and other companies owned by T. Ganbold. I heard repeatedly how [Defendant]

---

[2] https://www.treasury.gov/press-center/press-releases/Pages/jl2572.aspx.

Ganbold instructed B. Altantuyaa and B. Batzorig to transfer the money to (his) account." Ex. 1, ¶36.

73.    But BatBrothers and Defendant Ganbold were evidently concerned that the tax records would prevent the issuance of summary judgment in their favor and forestall international enforcement against Plaintiff under the Surety.  So, BatBrothers and Defendant Batzorig created fictitious documents to fill the gap.

74.    BatBrothers in response to Plaintiff's opposition, submitted the November 16, 2018 reply affidavit of Defendant Batzorig ("11-16-2018 Affidavit").  In that affidavit, Batzorig claimed that GEM's debt to BatBrothers amounted to $52,901.436 and that BatBrothers had received only $3,806,721 in cash from GEM.  (New York Action, Dkt. 223.) Thus, BatBrothers was in a position to demand all of Plaintiff's remaining debt under what proved to be a fictitious November 2015 settlement agreement.

75.    Defendant Batzorig also affirmed that BatBrothers and GEM held a meeting on December 7, 2015 whereupon each party agreed that GEM owed BatBrothers a total of $27,657,336.76 ("December 7, 2015 Minutes of Meeting").  This document was attached to the affirmation and is attached hereto as Exhibit 7.  This document was purportedly signed on GEM's behalf by Mayagmarsambu Ider, the Executive Director of GEM.  This document is a fiction as Defendant Batzorig and Defendant Ganbold were aware of when it was submitted to the New York Supreme Court.

76.    Another fictitious document allegedly demonstrates that GEM's debt as of November 6, 2018 was acknowledged by GEM as amounting to $27,433,181.76 (called by BatBrothers the "2018 Debt Confirmation").  This document too was signed by M. Ider on GEM's behalf, and is attached as Exhibit 8.

77.     In issuing summary judgment in BatBrothers' favor, the New York Supreme Court specifically relied on the 2018 Debt Confirmation, finding the Russian Judgment final in part because the Debt Confirmation showed that GEM owed a debt of $27,433,181.76. (Dkt. 244, at 7 & 14.)

78.     But as Mr. Tsogtgerel affirms, at the time, he was the First Deputy Director of GEM from September 2013 until May 2017, and "can affirm that there was no such [December 7, 2015] meeting, and no act of mutual debt settlement was adopted.  These legal documents and settlement issues were party of my responsibilities and could only be drafted only after [he] left GEM for subsequent use in the courts."  Ex. 1 at ¶40.

79.     Moreover, these fictitious GEM documents were signed by persons owing loyalty to Defendant Ganbold, not to their respective companies.  M. Ider signed each document on behalf of GEM.  But as Mr. Tsotgerel affirms, Mr. Ider only has the title Executive Director of GEM while [Defendant] Ganbold makes "all decisions on company management, asset management and cash management as Director General."  Based on information and belief, the documents were created for the purpose of litigation, and are not business or contemporaneous records.

80.     The Economic Crimes Division of the Mongolian government after becoming aware of Defendant Ganbold and GEM's misdeeds, began an investigation ("The Economic Crimes Investigation") pursuant to which inquiries were made concerning the alleged debt GEM owed BatBrothers.

81.     On April 22, 2020, the Mongolian Internal Revenue Department reported to the Economic Crimes Division in its examination of the fiscal documents available that no information was found about debt to BatBrothers by GEM in the period from 2015-2019.  Ex. 9, attached.

82.    The Mongolian Internal Revenue Department also reported that no debt was reported by BatBrothers from GEM in the period from 2015-2019. Ex. 10, attached.

83.    As a result of the above-described conduct of the Defendants, Plaintiff suffered, and continues to suffer, substantial damages.

## FIRST CAUSE OF ACTION

## FAIR DEBT COLLECTION PRACTICES ACT (FDCPA), 15 U.S.C. § 1692, et seq.

84.    Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint as if set forth fully at length herein.

85.    Plaintiff is a protected consumer under the FDCPA as a person allegedly obligated to pay a debt.

86.    Defendants Ganbold, Bataar, Titarenko, Protasov and Muranov are debt collectors under the FDCPA as they employ agents of debt collection such as Gorsoan Ltd. to collect debts worldwide, including from Plaintiff.

87.    Defendant GPB is a debt collector under the FDCPA although an original creditor under the Loan Agreement as GPB in conjunction with Defendant Ganbold caused another third party, BatBrothers, to assume false debt collection activity as a front for GPB's and/or Titarenko, Protasov and Muranov's ultimate enrichment. Legal expenses from the collection were paid not by BatBrothers but by GPB.

88.    To collect a fictitious debt from Plaintiff that does not exist, Defendant GPB has acted in a manner to harass, oppress and abuse Plaintiff, including: a) threatening physical harm to the person of Plaintiff; b) causing actual harm to the reputation of Plaintiff; and c) repeatedly attempting to bring criminal actions against Plaintiff. At all times pertinent hereto, Defendant Muranov has been the agent of GPB with respect to this conduct.

89.     Defendant Batzorig on multiple occasions described above falsely represented under oath that Plaintiff owed over $25 million under the Russian Judgment, when in fact Plaintiff owed nothing.  Defendant Batzorig's falsehoods related to the character and amount of the debt he alleged Plaintiff owed.

90.     Defendants Ganbold and Batzorig created false documents, including the December 7, 2015 Minutes of Meeting and the 2018 Debt Reconcilation, to improperly secure the New York Judgment of Enforcement against Plaintiff.

91.     Defendants Ganbold and Batzorig caused these false documents to be filed with the New York Supreme Court and were instrumental in securing the New York Judgment of Enforcement against Plaintiff.

92.     In 2018, Defendant Batzorig relying on these false representations and deceptive means attempted to secure payments from Plaintiff directly in telephone conversations with Plaintiff.

93.     Defendant Ganbold instructed Defendant Batzorig to make such false representations, and himself engaged in several telephone conversations with Plaintiff, at times with Defendant Batzorig as well to secure payments from Plaintiff.

94.     The use of legal process in the New York Supreme Court to secure from Plaintiff a debt he did not owe and the knowing filing of false documents and affidavits concerning the character and amount of the fictitious debt, were unfair and unconscionable means under the FDCPA.

95.     The use of legal process caused Plaintiff substantial damages, including legal fees and a substantial decline in his personal health, including a heart attack and extensive surgery on June 12, 2019.  Plaintiff is still recovering from that surgery.

96.     Defendants' conduct violative of the FDCPA entitles Plaintiff to the award of actual damages, additional damages and the award of reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

## NEW YORK GENERAL BUSINESS LAW § 349

97.     Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint as if set forth fully at length herein.

98.     Defendants each engaged in conduct that was consumer-oriented in that scheme to defraud Plaintiff went well beyond that of private contractual dispute.  Defendants involved themselves in a scheme to file false affidavits and documents to secure an improper judgment as a "bonus" against an alleged debtor, knowing there was no debt.  The proceeds of the scheme were to be shared among the participants at Plaintiff's expense.

99.     The New York Action was brought to collect a fictitious debt and was filed and prosecuted without any valid basis and without any valid evidentiary support.

100.    Defendants through their conduct engaged in multiple deceptive acts and practices, particularly in the filing of false affidavits and falsified documents with the New York Supreme Court.

101.    Defendants' conduct, violative of the GBL § 349, entitles Plaintiff to the award of actual damages, and the award of reasonable attorneys' fees.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiff prays for judgment in their favor against Defendants, and each Defendant, as follows:

A)      An award of Plaintiff's actual damages;

B)      An award of additional damages under the FDCPA and GBL 349;

C)      An judicial declaration to pierce the corporate veil of BatBrothers LLC in that

BatBrothers is under the exclusive control of Tordai Ganbold, possesses insufficient funds to

satisfy a judgment; has been used by the Defendants as a front in the creation of false affidavits

and false documents;

D)      Equitable tolling of claims to the extent allowed by the revelations of the Tsogtgerel

affirmation, dated June 8, 2010.

E)       that Defendants be ordered to pay Plaintiff pre-judgment and post-judgment interest on

all applicable damages;

F)       that Defendants be permanently enjoined from any attempt to further collect the New

York Judgment of Enforcement, and

G)      such other or further relief as the Court may deem proper.


Dated:      June 22, 2020                                   WUERSCH & GERING LLP
            New York, New York


                                                           By:_____
                                                               Kevin Murphy
                                                           *Attorneys for Plaintiff Sergey Viktorovich
                                                           Paushok*
                                                           100 Wall Street
                                                           New York, NY 10005
                                                           212-509-5050
                                                           Kevin.Murphy@wg-law.com